**DEFENSE LOGISTICS AGENCY, et al., Petitioners,**

v.

**FEDERAL LABOR RELATIONS AUTHORITY, Respondent.**

No. 83–2017.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 18, 1984.

Decided Feb. 15, 1985.

William Kanter, Atty., Dept. of Justice, Washington, D.C., with whom Richard K. Willard, Acting Asst. Atty. Gen., Washington, D.C., was on brief for petitioners.

Robert J. Englehard, Atty., Federal Labor Relations Authority, Washington, D.C., with whom Ruth E. Peters, Sol., and Steven H. Svartz, Deputy Sol., Federal Labor Relations Authority, Washington, D.C., were on brief for respondent, Federal Labor Relations Authority. William R. Tobey, Atty., Federal Labor Relations Authority, Washington, D.C., also entered an appearance for respondent.

Before GINSBURG and STARR, Circuit Judges and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge McGOWAN.

McGOWAN, Senior Circuit Judge:

This petition for direct review of a ruling by the Federal Labor Relations Authority (Authority) presents a novel issue of statutory construction under the Labor-Management Relations Chapter of the Civil Service Reform Act of 1978, 5 U.S.C. §§ 7101–7135 (1982) [hereinafter "the Statute"], the law that structures labor-management relations in the federal sector. The specific provision involved is § 7117, which in part concerns assertions by government agencies that a particular matter is not negotiable because it is governed by an agency-wide rule. Section 7117 provides that such a matter is negotiable unless there is a compelling need for the rule, and it establishes a procedure by which the Authority may determine the existence *vel non* of compelling need.

▆▆▆ Petitioners are the Defense Logistics Agency (DLA), which is a national subdivision of the Department of Defense; and the Defense Contract Administration Service Region-Boston (DCASR-Boston), a subordinate office within DLA. In an unfair-labor-practice (ULP) proceeding brought against petitioners for refusal to bargain over a newly promulgated DLA personnel rule, the Authority determined that there was no compelling need for the rule and that the rule was thus negotiable under the Statute. Petitioners claim that the Statute denies the Authority the "jurisdiction" to decide the compelling need issue except in the separate, expedited proceeding under § 7117(b) of the Statute. Upon reviewing the Statute, the legislative history, and the policies underlying the parties' positions, we are persuaded that, although the Authority's understanding of § 7117 is not the only one possible, it is certainly reasonable. Our obligation of deference to an agency's interpretation of its own statute therefore leads us to affirm the Authority's assertion of jurisdiction to decide the compelling need issue in this ULP proceeding. Because petitioners lacked a meaningful opportunity to present evidence on that issue before the Authority, however, we remand this case for a redetermination of whether the rule in question was supported by a compelling need.

## I.

In May 1979, DLA issued a revised "standard of conduct" regulation, DLAR No. 5500.1, which, *inter alia*, redefined the class of DLA employees required to file "Confidential Statements of Affiliations and Financial Interests." DCASR-Boston announced the changes to its employees in a bulletin issued in July 1979; in September, DCASR-Boston set a deadline of October 31, 1979, for the filing of disclosure statements. By letter dated October 24, 1979, the National Association of Government Employees (NAGE), which represents an appropriate bargaining unit of employees at DCASR-Boston, requested negotiations on the changes in the filing criteria. In response, DCASR-Boston invited NAGE to comment upon the revised regulation and extended the filing deadline to November 30, 1979. In a meeting between the parties in early November, NAGE protested the delay between DLA's issuance of the revised regulation and DCASR-Boston's announcement of it. NAGE requested that DCASR-Boston postpone the filing deadline pending resolution of complaints over the new filing criteria. NAGE also proposed that the revised regulation not be applied to current employees. DCASR-Boston responded that it lacked authority to bargain over such matters. That refusal to negotiate was reiterated at a second meeting in early December, whereupon NAGE filed a ULP charge with the Authority.

In a complaint issued in April 1980, the FLRA General Counsel charged petitioners [1] with violating § 7116(a)(1) and § 7116(a)(5) of the Statute [2] by, *inter*

---

**1.** Eight subordinate offices of DCASR were also charged.

**2.** Section 7116(a)(1) makes it an unfair labor practice for an agency "to interfere with, restrain, or coerce any employee in the exercise by the employee of any right under this chapter." Under § 7116(a)(5) it is a ULP "to refuse to consult or negotiate in good faith with a

*alia,* changing existing conditions of employment without first notifying NAGE and affording it an opportunity to bargain over the substance, impact, and implementation of the change. In July 1980, an Administrative Law Judge (ALJ) held a hearing in the case.

The ALJ found that petitioners' refusal to bargain over the substance of the change in personnel rules did not amount to a violation of the Statute. *See Defense Logistics Agency,* No. 1–CA–213, slip op. at 13–16 (July 7, 1981) (Dowd, A.L.J.), in Joint Appendix (JA) at 528–31. He based his decision on his interpretation of § 7117 of the Statute, which provides, in relevant part:

(a)(2) The duty to bargain in good faith shall, to the extent not inconsistent with Federal law or any Government-wide rule or regulation, extend to matters which are the subject of any agency rule or regulation referred to in paragraph (3) of this subsection only if the Authority has determined under subsection (b) of this section that no compelling need (as determined under regulations prescribed by the Authority) exists for the rule or regulation.

(3) Paragraph (2) of the subsection applies to any rule or regulation issued by any agency or issued by any primary national subdivision of such agency, unless an exclusive representative represents an appropriate unit including not less than a majority of the employees in the issuing agency or primary national subdivision, as the case may be, to whom the rule or regulation is applicable.

(b)(1) In any case of collective bargaining in which an exclusive representative alleges that no compelling need exists for any rule or regulation referred to in subsection (a)(3) of this section which is then in effect and which governs any matter at issue in such collective bargaining, the

Authority shall determine under paragraph (2) of this subsection, in accordance with regulations prescribed by the Authority, whether such a compelling need exists.

(2) For the purpose of this section, a compelling need shall be determined not to exist for any rule or regulation only if—

(A) the agency, or primary national subdivision, as the case may be, which issued the rule or regulation informs the Authority in writing that a compelling need for the rule or regulation does not exist; or

(B) the Authority determines that a compelling need for a rule or regulation does not exist.

(3) A hearing may be held, in the discretion of the Authority, before a determination is made under this subsection. If a hearing is held, it shall be expedited to the extent practicable and shall not include the General Counsel as a party.

(4) The agency, or primary national subdivision, as the case may be, which issued the rule or regulation shall be a necessary party at any hearing under this subsection.

5 U.S.C. § 7117(a)(2)–(b) (1982).

In the ALJ's reading of these provisions, no duty to bargain over matters that are the subject of an agency-wide rule [3] would arise unless and until the Authority determined the absence of any compelling need for the rule.[4] Because a ULP action for failure to bargain could not be sustained unless the duty to bargain had first been established, and given that § 7117(b) provides a means for resolving the compelling need issue, the ALJ ruled that a determination of compelling need could not be made initially in a ULP proceeding. Since the Authority had not made a § 7117(b) determination of lack of compelling need, the

---

labor organization as required by this chapter." 5 U.S.C. § 7116(a)(1), (5) (1982).

**3.** The term "agency-wide rule," as used herein, encompasses any rule or regulation issued by any agency or by any "primary national subdivi-

sion," 5 U.S.C. § 7117(a)(3) (1982), of an agency.

**4.** The criteria for determining compelling need are set forth in Part 2424.11 of the Authority's regulations. 5 C.F.R. § 2424.11 (1984).

ALJ held himself precluded from finding that the refusal to bargain over the substance of the new disclosure rule constituted an unfair labor practice.[5]

On review of the case, the Authority disagreed with the ALJ's holding that the compelling need issue may never be determined in a ULP proceeding.[6] The Authority conceded that the § 7117(b) negotiability appeal is the sole avenue for resolving the question of compelling need in the case "where an exclusive representative submits proposals on a matter subject to collective bargaining and the agency or activity asserts that such proposals are nonnegotiable because they conflict with an existing agency regulation for which a compelling need exists." *Defense Logistics Agency*, 12 F.L.R.A. No. 86, at 4 (1983), JA at 570. Under § 7117, when the parties are engaged in ongoing negotiations, there must be a finding pursuant to § 7117(b) that no compelling need exists for the regulation before the duty to bargain arises, and therefore, before refusal to bargain can amount to a ULP.

According to the Authority, however, a different case is presented when "actual or contemplated changes in conditions of employment are involved," *id.*, JA at 570, for such a situation implicates the Authority's "statutory authority to resolve disputes involving alleged unilateral changes in conditions of employment where issues of negotiability are also raised." *Id.*, JA at 570. The promulgation of a new agency-wide rule that effects such changes, the Authority maintained, subjects the promulgating agency to a ULP proceeding, to the same extent as would any unilateral change by the agency in the terms or conditions of employment. If in the course of such a ULP proceeding, the agency asserts as a defense that the newly promulgated rule was supported by a compelling need, the Authority is within its statutory power in resolving the compelling need issue in that same proceeding. The Statute, according to the Authority, imposes no requirement that the compelling need issue first be resolved in a § 7117(b) proceeding before the Authority can entertain a ULP proceeding for a unilateral change in the form of a new agency-wide rule.[7] The Authority's Rules and Regulations thus "recognize a labor organization's right to seek a resolution of the negotiability issues by filing an unfair labor practice charge and a negotiability appeal and ... require the labor organization to select the forum in which to proceed first." *Id.*, JA at 570.[8]

---

**5.** *See Defense Logistics Agency*, slip op. at 13–16, JA at 528–31. The ALJ further held that, as to the impact and implementation of the change, NAGE had had sufficient opportunity to request bargaining, and lack of bargaining did not constitute a violation of the Statute by DLA. The ALJ therefore dismissed the action as against DLA. With respect to DCASR-Boston, however, the ALJ found that it had violated subsections 7116(a)(1) and (5) by failing to give NAGE prior notice of the change in regulations. Nevertheless, the ALJ declined to order bargaining on the ground that NAGE could have requested it before the effective date of the new regulation. *See id.* at 16–20, JA at 531–35.

**6.** *Defense Logistics Agency*, 12 F.L.R.A. No. 86, at 3–5 (1983), JA at 569–71. The Authority did, however, affirm the ALJ's dismissal of DLA. *Id.* at 6 & n. 9, 10, JA at 572 & n. 9, 576.

**7.** The Authority has never explicitly addressed the issue of when the duty to bargain actually arises in this second situation of a "unilateral change." Its interpretation, however, would seem to imply that if there is found, during the ULP proceeding, to be no compelling need for the rule, the duty to bargain is retroactively deemed to arise at the time of the promulgation of the rule. This contrasts with the ongoing negotiations situation, where, under either the Authority's or DLA's view, the duty to bargain does not arise until the determination of no compelling need is made. Our understanding of the Authority's view is confirmed by the fact that both the Authority and DLA appear to assume that a finding of negotiability under § 7117(b) would have prospective effect only, whereas a finding of an unfair labor practice would have retroactive effect. *See* Tape of Oral Argument at 183–86; Brief for the Federal Labor Relations Authority at 20.

**8.** Part 2423.5 of the Authority's regulations, 5 C.F.R. § 2423.5 (1984), provides, in part:
 Where a labor organization files an unfair labor practice charge pursuant to this part which involves a negotiability issue, and the labor organization also files pursuant to Part 2424 of this subchapter a petition for review of the same negotiability issue, the Authority and the General Counsel ordinarily will not process the unfair labor practice charge and

In accordance with its regulations, the Authority held that when the union selects the ULP forum to challenge a unilateral change in conditions of employment that results from a revised agency regulation, and management asserts as an affirmative defense that it had no duty to bargain because there was a compelling need for the regulation, the issue of compelling need must be resolved in the ULP proceeding. Moreover, the Authority held, the agency would have the burden of proving compelling need in the ULP proceeding, just as it would in the § 7117(b) proceeding. *Id.* at 5, JA at 571.

Here, the Authority found, the record revealed no evidence of compelling need for DLAR 5500.1. *Id.*, JA at 571. Noting a previous decision establishing that standards-of-conduct regulations such as DLAR 5500.1 are negotiable,[9] the Authority concluded that the refusal to bargain over the revised regulation amounted to a violation of the duty to bargain in good faith. *Id.* at 6, JA at 572.[10] The Authority therefore ordered rescission of revised DLAR 5500.1 and reinstatement of the former regulation as to the bargaining unit involved at DCASR-Boston. The Authority further ordered DCASR-Boston to notify NAGE of any intended future revision of the regulation and to bargain in good faith should NAGE request negotiation over the revision. *Id.* at 9–10, JA at 575–76. This appeal followed.

## II.

Petitioners contend that the Authority's determination of the compelling need issue in a ULP proceeding contravened the mandate of § 7117. Petitioners point to § 7117(a)(2), which provides, in part, that "[t]he duty to bargain in good faith shall ... extend to matters which are the subject of any agency rule ... only if the Authority has determined under subsection (b) of this section that no compelling need ... exists for the rule." In petitioners' view, the phrase "has determined" is a clear bar to resolving the compelling need issue in a ULP proceeding. Petitioners' argument is as follows: A ULP action must, of course, be predicated on a ULP, and refusal to bargain does not constitute a ULP unless there was a duty to bargain. The provision quoted above makes clear that no duty to bargain over a matter covered by an agency-wide rule arises until there has been a determination under § 7117(b) that no compelling need exists for the rule. Therefore, a ULP proceeding for refusal to bargain over matters that are subject to an agency-wide rule cannot be sustained unless there has been a § 7117(b) proceeding resulting in a determination of no compelling need.

The Authority disagrees, relying on § 7117(b)(1) of the Statute, which states, in part, that "[i]n any case of *collective bargaining* in which an exclusive representative alleges that no compelling need exists for any rule ... *which is then in effect* and which governs any matter at issue *in such collective bargaining*, the Authority shall determine ... whether such a compelling need exists." 5 U.S.C. § 7117(b)(1) (1982) (emphasis added). The italicized portions

the petition for review simultaneously. Under such circumstances, the labor organization must select under which procedure to proceed. Upon selection of one procedure, further action under the other procedure will ordinarily be suspended. ... Cases which solely involve an agency's allegation that the duty to bargain in good faith does not extend to the matter proposed to be bargained and which do not involve actual or contemplated changes in conditions of employment may only be filed under Part 2424 of this subchapter.

Part 2424.5, 5 C.F.R. § 2424.5 (1984), is identical to the preceding provision except in its final sentence, which states:

Cases which solely involve an agency's allegation that the duty to bargain in good faith does not extend to the matter proposed to be bargained and which do not involve actual or contemplated changes in conditions of employment may only be filed under this part.

**9.** The Authority cited AFGE Local 3385, 7 F.L.R.A. 398, 403–08 (1981).

**10.** The Authority also affirmed the ALJ's finding that DCASR-Boston had violated the Statute by failing to notify NAGE of the new regulation and afford it an opportunity to bargain over the regulation's impact and implementation.

of this provision, according to the Authority, clearly support the distinction between, on the one hand, an agency's refusal to bargain over a proposal put forth during ongoing negotiations that concerns a matter covered by an existing agency-wide rule, and, on the other hand, a refusal to bargain over a new agency-wide rule that effects a change in working conditions. Section 7117(b)'s reference to cases of "collective bargaining" over a matter covered by a rule "then in effect," the Authority argues, excludes this latter situation from the provision's purview.

The Authority's interpretation of § 7117 receives some support in the legislative history of that provision. A House Committee report on an earlier version of § 7117— under which *government*-wide rules would have been subject to the compelling need standard, and *no* agency-wide rule would have barred negotiations—provided the following illustration:

> [I]f an agency were to have a regulation stating that each male employee in the agency must wear a necktie while on duty, and a labor organization holding exclusive recognition for a unit within the agency were to make a proposal that male employees be permitted not to wear neckties during the summer months, the agency could not invoke its regulation as a bar to negotiations on the proposal. Similarly, an agency regulation restricting the area of consideration for promotion eligibility could not be invoked as a bar to a proposal for a wider area of consideration.

H.R.Rep. No. 1403, 95th Cong., 2d Sess. 51 (1978), *reprinted in* Subcommittee on Postal Personnel and Modernization of the House Comm. on Post Office and Civil Service, 96th Cong., 1st Sess., Legislative History of the Federal Service Labor-Management Relations Statute, Title VII of the Civil Service Reform Act of 1978, at 697 (Comm.Print 1979) [hereinafter cited as Legislative History]. Moreover, in discussing the compelling need issue, the report stated that the compelling need determination must be expedited "so as not to delay unduly the completion of *ongoing negotia-*

*tions." Id.* at 52, *reprinted in* Legislative History, *supra,* at 698 (emphasis added). The references to "proposals" and "ongoing negotiations" suggest that the draft provision was understood merely to establish a procedure for dealing with assertions by an agency, *during the course of negotiations,* that a particular union proposal is nonbargainable because it conflicts with an agency-wide rule, rather than to govern proceedings over alleged unilateral changes in working conditions effected through the promulgation of an agency-wide rule. It would, however, be unwise to place great weight on these remarks, not only because the provision to which they pertain was altered significantly before adoption, but also because they are quite consistent with a requirement that in unilateral change cases, not just ongoing negotiations cases, the issue of compelling need be resolved in a § 7117(b)-type proceeding.

The other source of insight into the intent behind § 7117, and the one chiefly relied upon by the Authority, is pre-Statute practice under executive order. In 1975, the Federal Labor Relations Council, the Authority's predecessor, issued a report summarizing then-current federal labor relations practice under Executive Order 11,491 and recommending certain changes that were then implemented by Executive Order 11,838 (1975). Certain parts of the Statute, including, both parties agree, the compelling need provisions, essentially track pre-Statute practice. The Report and the 1975 Order are therefore important to understanding what the Statute's drafters intended to achieve by § 7117. *See Bureau of Alcohol, Tobacco & Firearms v. FLRA,* 464 U.S. 89, 104 S.Ct. 439, 78 L.Ed.2d 195 (1983).

It was in the Council's Report that the idea of a compelling need requirement was first introduced:

> Under ... the present Order, a higher level agency regulation bars negotiation on any conflicting bargaining proposal regardless of the degree of necessity for the regulation. To the extent that such

regulations are asserted as a bar to negotiations, the goal of providing employees an opportunity to participate in the formulation and implementation of personnel policies and practices affecting the conditions of their employment is not fully achieved.

Some labor organizations and agencies suggested the concept of permitting internal agency regulations at a higher level, covering personnel policies and practices and matters affecting working conditions, to bar negotiations at the local level only if a "compelling need" for such regulations exists. Regulations, the need for which is not compelling, would not be available as a bar to negotiations although they would retain their full force and effect in all other respects. The Council finds merit in this suggestion and recommends that it be adopted.

Labor-Management Relations in the Federal Service, January 1975: Report and Recommendations of the Federal Labor Relations Council on the Amendment of Executive Order 11,491, as amended, *reprinted in* Legislative History, *supra*, at 1306–07. The Report went on to state that "disputes as to whether an agency regulation, as interpreted by the agency head, meets the standard of 'compelling need' should be resolved by the Council on a case-by-case basis in negotiability appeals filed under section 11(c) of the Order." *Id.* at 1307.

The Council's recommendation was effectuated in Executive Order 11,838, in 1975. The Order stated:

An agency and a labor organization that has been accorded exclusive recognition, through appropriate representatives, shall meet at reasonable times and confer in good faith with respect to personnel policies and practices and matters affecting working conditions, so far as may be appropriate under applicable laws and regulations, including ... published agency policies and regulations for which a compelling need exists under criteria established by the Federal Labor Relations Council ....

Executive Order No. 11,838 (1975), *reprinted in* Legislative History, *supra*, at 1338. The Order further provided that "[i]f, in connection with negotiations, an issue develops as to whether a proposal is contrary to law, regulation, controlling agreement, or this order and therefore not negotiable," the issue would be resolved by appeal to the Council. *Id.* at 1339.

The compelling need standard and the appeal procedure in which it is to be applied were clearly the basis of the later § 7117(b) provision. In DLA's view, the Report and Order indicate that the compelling need issue was never to be resolved in a ULP proceeding, but only in a negotiability appeal pursuant to section 11(c), the precursor of the § 7117(b) negotiability appeal.

We note, however, that both the Report and Order explicitly referred only to cases involving "proposals" during negotiations, and not all cases in which the compelling need issue might arise. That seeming limitation on the applicability of the compelling-need appeal proceeding was stressed in the Report just after the compelling need standard was introduced:

It must be emphasized in connection with the foregoing recommendations, that we are here concerned only with the question of whether a higher level internal agency regulation covering personnel policies and practices or matters affecting working conditions should serve as a bar to negotiations on a conflicting proposal submitted at the local level.

*Id.* at 1307–08 (emphasis omitted). In the Authority's view, the Report thus clearly indicates that the compelling-need negotiability appeal was originally contemplated as a means of resolving, not disputes over alleged unilateral changes, but only disputes arising during ongoing negotiations, when the bargaining representative submits a proposal that the government employer deems in conflict with one of its rules.

In further support of its view, the Authority directs our attention to a later discussion in the Report. Under then-current practice, the Assistant Secretary of Labor

was authorized to decide ULP complaints, including complaints that a party refused to negotiate in good faith. The Assistant Secretary consistently ruled, however, that a party could not use the ULP provisions "for resolving negotiability disputes which arise in connection with negotiations," *id.* at 1325, unless the matter excluded from negotiation had already been determined by the Council to be negotiable through the procedures set forth in section 11(c) of the Order, referred to above. The Report stated:

> [T]he changes which we here propose would not affect the existing authority of the Council to resolve, under the section 11(c) procedures, negotiability disputes which arise in connection with negotiations nor would these changes affect the existing responsibility of the Assistant Secretary to rely upon Council precedent to resolve negotiability issues that arise in unfair labor practice cases.
>
> The amendments which we propose would affirm the authority of the Assistant Secretary, in the context of certain unfair labor practice cases, to resolve negotiability issues, even though there is no existing Council precedent to guide him, so long as these issues do not arise in connection with negotiations between the parties but rather as a result of a respondent's alleged refusal to negotiate by unilaterally changing an established personnel policy or practice, or matter affecting working conditions.

*Id.* at 1324.

The Report noted the objection that the Assistant Secretary's exercise of such authority "would result in a bifurcation in the jurisdiction to make negotiability determinations (with the Council retaining the authority to determine negotiability questions raised in connection with negotiations); it was contended that this would lead to conflicting lines of precedential case authority." *Id.* at 1324–25. The Council responded to this objection as follows:

> While this argument is not without merit, we are of the opinion that the purposes of the Order would be better served, on balance, by permitting the Assistant Secretary to exercise the authority to hear and rule on negotiability questions which arise in the context of an unfair labor practice proceeding, resulting from a unilateral change in established personnel policies and practices and matters affecting working conditions rather than requiring such cases to come first to the Council.
>
> Unnecessary additional steps in the adjudicatory process would be required if such negotiability issues were brought to the Council for initial adjudication. In those cases which involved alleged unfair labor practices, the Council, following its decision on the negotiability issue, would have to remand the matter to the Assistant Secretary for further action because section 6 of the Order charges the Assistant Secretary with responsibility for issuing decisions in unfair labor practice cases.[11]

The Council's position was expressly adopted in Executive Order 11,838:

> If, as the result of an alleged unilateral change in, or addition to, personnel policies and practices or matters affecting working conditions, the acting party is charged with a refusal to consult, confer or negotiate as required under this order, the Assistant Secretary may, in the exercise of his authority under sec-

---

11. Legislative History, *supra*, at 1324–25. The Council further noted that it had considered and rejected the alternative of requiring the Assistant Secretary to remit to the Council any negotiability issues arising in the course of a ULP proceeding and to defer his decision on the alleged unfair labor practice until the Council had resolved the negotiability issues. The Report explained:

> Where negotiability issues arise in the context of such unfair labor practice proceedings they are often inextricably intertwined with disputed issues of fact which must be resolved in order to arrive at a conclusion concerning the motivation of the parties. Such disputed issues of fact are best resolved through the adversary process of a formal hearing. For this reason, and because of the delays attendant in such a referral procedure, the Council does not believe that such an alternative is feasible or appropriate.

*Id.* at 1326–27.

tion 6(a)(4) of the order, make those determinations of negotiability as may be necessary to resolve the merits of the alleged unfair labor practice.

*Id.* at 1339.

The Order, and the Report that led to it, thus seem to support the Authority's position that the compelling need issue may be resolved in a ULP proceeding arising from an alleged unilateral change in working conditions. Petitioners, however, offer a different interpretation of these texts. They concede that issues of negotiability were *in general* resolvable in the course of ULP proceedings arising out of unilateral changes by a government employer. Nonetheless, they argue, when a unilateral change was effected *through an agency-wide rule,* the compelling need aspect of the negotiability issue was to be resolved only via the predecessor to the § 7117(b) negotiability appeal—the expedited compelling need determination. The provision preserving the Assistant Secretary's power to make "determinations of negotiability" in ULP proceedings, they argue, was not meant to apply to the compelling need aspect of negotiability, contrary to the Authority's view. Rather, petitioners argue, the compelling need provisions explicitly exempt that aspect of the negotiability issue from resolution by any means other than the special compelling need determination. Reply Brief for Petitioners/Cross-Respondents at 3–5.

The dispute over the Report and Order, then, is a dispute over how to fit together the compelling need provisions and the provisions permitting negotiability determinations in ULP actions. The references to "bargaining proposals" in the compelling need provisions reinforce our sense that it is more natural to read "negotiability" as meaning *all* aspects of negotiability, including compelling need. Nonetheless, we must concede, that reading is not required.[12]

### III.

Having exhausted the legislative history as a source of aid in resolving the ambiguity of the Statute, we turn to consider the arguments of effect advanced by both sides in this dispute. Petitioners argue that the § 7117(b) determination offers several advantages over the ULP proceeding and should therefore not be bypassed even when a unilateral change in working conditions is in question. In particular, petitioners stress that the Statute requires § 7117(b) hearings to be "expedited to the extent practicable," 5 U.S.C. § 7117(b)(3) (1982), and mandates the absence of the Authority's General Counsel and the presence of the issuing agency or primary national subdivision in such hearings.[13]

Because of these procedural characteristics, petitioners contend, the § 7117(b) procedure is superior to a ULP proceeding in removing impediments to bargaining and in simplifying and clarifying the issues to be negotiated. The negotiability appeal provides a speedy means of resolving the ne-

12. The problem of reconciling the two sets of provisions in the Report and Order, it seems to us, raises a further question that the disputants here have not addressed, specifically, the question of whether the compelling need requirement is at all relevant, once it is assumed that it was formulated in provisions that were drafted to deal with the problem of breakdowns in ongoing negotiations. Presumably, the Authority would respond that the compelling need requirement was intended to apply in all contexts in which an agency might attempt to avoid bargaining over matters covered by agency-wide rules; simply because the requirement was articulated in a provision addressed to the ongoing negotiations context is no reason to abandon it in the unilateral change context. No doubt, petitioners would contest the premise

that the compelling need requirement was more broadly conceived than was the procedure in which it was meant to be applied. Again, the argument would be unresolvable by reference only to the texts.

13. We note, however, that Congress, in choosing to make hearings under § 7117(b) optional, rather than mandatory, explicitly declined to guarantee that the issuing agency would always be a part of the compelling need determination, or that the General Counsel would be wholly excluded from it. According to counsel for the Authority, never before has a hearing been held in a § 7117(b) determination. *See* Tape of Oral Argument at 201–02.

gotiability of a national rule, at the national, rather than merely local, level. After a negotiability appeal under § 7117(b) has reached its conclusion, the parties "may very well go back to the bargaining table and, depending on the nature of the Authority's ruling, could reach a voluntary settlement, thereby avoiding further litigation." Brief for Petitioners/Cross-Respondents at 20. In contrast, petitioners contend, the atmosphere of a ULP proceeding "is distinctly adversarial, and the end result may be severe sanctions or an order against the agency." *Id.* An order reinstating the former rule, for example, could engender great confusion and administrative costs for the governmental employer. *See* Tape of Oral Argument at 186–91. Consequently, petitioners assert, the agency "would be faced with implementing the regulations at its peril" and might well decide to forego needed revisions of regulations. Brief at 21. Ultimately, the Authority's decision could "paralyze the government in its ability to institute and revise regulations." *Id.*

The Authority, in turn, points out that an agency's refusal to bargain over a new rule may raise issues other than compelling need and negotiability. If a rule was non-negotiable in substance, for example, there might still be the question of whether the agency gave proper notice before putting the rule into effect, and the question of whether the agency satisfied its duty to negotiate over the impact and implementation of the rule. If a rule was negotiable, there might still be the question of whether the union somehow waived its right to good faith negotiations over the rule. As the Authority recognizes:

> In all such cases, separating out, and appealing first, a negotiability issue in a unilateral change unfair labor practice case delays rather than expedites resolu-

tion of the case. The remaining aspects of the unfair labor practice case would have to be held in abeyance awaiting determination of the negotiability issue. Only after the negotiability issue is resolved in the separate negotiability proceeding could the other aspects of the unfair labor practice case be resolved. Thus, the procedure which best expedites resolution of the unilateral change unfair labor practice is unified processing within the unfair labor practice proceeding.

Additionally, in many unilateral change unfair labor practice cases it is difficult to separate clearly the negotiability issue from the unfair labor practice proceeding. In a unilateral change unfair labor practice case, the resolution of the issue whether management's change in working conditions was a negotiable change often requires an examination of management's conduct, *i.e.*, what working conditions did management actually change. Such an examination may require the same witnesses, and their same testimony, as are needed to resolve the remaining aspects of the unilateral change unfair labor practice case. Consequently, an attempt to separate the negotiability determination from determinations on the remaining aspects of the unfair labor practice case runs the risk of variant conclusions about the credibility of witnesses and their testimony, to say nothing about the duplication of effort.[14]

Perhaps more important than the Authority's desire to streamline and shorten the process for resolving cases of alleged failure to bargain over a negotiable issue are the Authority's concerns over the appropriate remedy for unilateral changes. From the perspective of the employees, the ULP proceeding is far more desirable than the § 7117(b) proceeding in the context of

---

14. Brief for the Federal Labor Relations Authority at 17–18. The Authority's reasoning calls to mind Zechariah Chafee's observation:

> The King of Brogdignag [sic] gave it for his opinion that, "whoever could make two ears of corn, or two blades of grass to grow upon a spot of ground where only one grew before, would deserve better of mankind, and do

more essential service to his country than the whole race of politicians put together." In matters of justice, however, the benefactor is he who makes one lawsuit grow where two grew before.

Z. Chafee, Some Problems of Equity 149 (1950).

an agency's refusal to bargain over a proposed or newly promulgated rule affecting working conditions. When an agency, during the course of negotiations over a contract, refuses to bargain over a proposal that the agency believes to be in conflict with an agency-wide rule, the employees suffer no harm or lost expectations; they simply fail in an effort to change existing working conditions. The effect of the agency's refusal to bargain, therefore, is to preserve the status quo in which the employees entered into bargaining. By contrast, when the agency refuses to bargain over a new rule, promulgated in the middle of a contract term, the employees are made to suffer whatever detriment (and, of course, gain whatever benefit) the rule effects. The refusal to bargain blocks return to the status quo ante. For precisely the same reason that DLA contests the ULP procedure in this context—namely, that it may have retroactive effect—the Authority sanctions it.

## IV.

Under § 7123(c) of the Statute, judicial review of Authority orders shall be on the record in accordance with § 706 of the Administrative Procedure Act, 5 U.S.C. § 706 (1982), which in turn provides that agency action shall be set aside only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1982). In applying this standard to the specific issue at hand, we are guided by the Supreme Court's recent pronouncement in *Bureau of Alcohol, Tobacco & Firearms v. FLRA*, 464 U.S. 89, 104 S.Ct. 439, 78 L.Ed.2d 195 (1983):

> [T]he FLRA was intended to develop specialized expertise in its field of labor relations and to use that expertise to give content to the principles and goals set forth in the Act. See § 7105; H.R.Rep. No. 95–1403, p. 41 (1978). Consequently, the Authority is entitled to considerable deference when it exercises its "special function of applying the general provisions of the Act to the complexities" of federal labor relations.

*Id.* at 444 (quoting *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 236, 83 S.Ct. 1139, 1149, 10 L.Ed.2d 308 (1963)) (further citations omitted). As the Court cautioned, however, "while reviewing courts should uphold reasonable and defensible constructions of an agency's enabling Act, they must not 'rubber-stamp ... administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute.'" *Id.* (quoting *NLRB v. Brown*, 380 U.S. 278, 291–92, 85 S.Ct. 980, 988–89, 13 L.Ed.2d 839 (1965)) (further citations omitted); *see also Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* — U.S. ——, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984).

Because of the ambiguity in the legislative intent behind § 7117, we cannot say with certainty that the Authority acted consistently with that provision. But neither can we say the Authority acted in contravention of the statutory purpose. The Authority simply followed one of two plausible readings of § 7117.

The Supreme Court has recently stated:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron*, 104 S.Ct. at 2781–82 (footnotes omitted). The Court stressed that "[t]he

court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id.* at 2782 n. 11 (citations omitted).

Having reviewed the statute and its legislative history, as well as the parties' policy arguments, we think it clear that the Authority's distinction between ongoing negotiations and unilateral changes reflects not only a permissible reading of the Statute, but also a reasonable one, in the truest sense—namely, that the Authority had good reasons for reading the Statute in that way. The distinction may not be the neatest way of parsing the Statute. Nevertheless, it is sufficiently supported by the legislative materials, as well as the Authority's concern over duplicative proceedings and delay [15] and prejudice to governmental employees. We therefore hold that in ULP proceedings over alleged unilateral changes in employment conditions effected by agency-wide rule, the Authority may determine whether there was a compelling need for the rule, and thus whether the rule was negotiable, without first hav-

ing made such a determination pursuant to § 7117(b).

Despite our conclusion that the Authority's interpretation of the Statute was reasonable, we are reluctant simply to affirm the Authority's disposition of this case. The record indicates that petitioners, assuming the impropriety of resolving the compelling need issue in a ULP proceeding, declined to present evidence of any compelling need for DLAR 5500.01 in the hearing before the ALJ. In light of the Statute's ambiguity, it would be harsh to treat petitioner's actions as a waiver of the compelling need issue. We therefore remand the proceeding to the Authority with the direction that petitioners be given a chance to present evidence on compelling need in a new ULP proceeding for failure to bargain over a change in the terms and conditions of employment.

*It is so ordered.*

---

**15.** *Cf. AFGE v. FLRA,* 715 F.2d 627 (D.C.Cir. 1983) (holding, under § 7117(c), that considerations of delay bar the Authority from rejecting the negotiability appeal in favor of a ULP proceeding in determining the negotiability of a proposal made during bargaining).